## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DEMOCRATIC PARTY OF GEORGIA ) | CIVIL ACTION FILE NO. |
| ) | |
| Plaintiff, ) | |
| v. ) | _____ |
| ) | |
| BRIAN KEMP, CANDICE BROCE, DOES ) | |
| 1-10, ) | |
| ) | |
| Defendants. ) | |

## **COMPLAINT**

This is an action under 42 U.S.C. § 1985 and the Voting Rights Act for declaratory relief, injunctive relief, and nominal damages because then-Secretary of State Brian Kemp and other Defendants baselessly accused the Democratic Party of Georgia of criminal conduct two days before the November 2018 election.

1.  In 2018, Defendant Brian Kemp was the Secretary of State of Georgia.

2.  As Secretary of State, it was Kemp's job to make sure that elections proceeded in a fair and unbiased manner.

#3094488v1

3.      Kemp was also a candidate in the governor's election that year. He claimed, however, that he could fairly manage an election at the same time as was running in it.

4.      Two days before the election, Kemp worked with others to release a statement on the Secretary of State's website that said in all capital letters: "AFTER FAILED HACKING ATTEMPT, SOS LAUNCHES INVESTIGATION INTO GEORGIA DEMOCRATIC PARTY."

5.      The statement further claimed to "confirm that the Democratic Party of Georgia is under investigation for possible cyber crimes," and noted that the FBI and Department of Homeland Security had been alerted.

6.      The Secretary of State's website is the place where voters, on the eve of an election, can access sample ballots, find a polling place and check their registration.

7.      Voters across the State who accessed the Secretary of State's website on the eve of the election were exposed to Defendants' baseless claims of "cyber crimes."

8.       In fact, there were no "cyber crimes," and absolutely no basis for claiming such against Plaintiff.

#3094488v1

9.     There were, however, two cybersecurity issues involving the Secretary of State in the lead-up to the "cyber crimes" statement.

10.     First, a private citizen completely unaffiliated with the Democratic Party of Georgia discovered a set of security flaws in the Secretary of State's own voting website. He duly reported the flaws to a Washington, D.C. election lawyer, who then reported the problem to Kemp's own lawyers and later the Democratic Party of Georgia's voter protection team was informed. The election lawyer, the Democratic Party of Georgia, a nonprofit voting rights organization, and the FBI all reported the flaws to the Secretary of State's Office.

11.     But of all the people who knew about and reported the security flaws, including Kemp's own lawyer, Defendants accused *only* the Democratic Party of Georgia of criminal activity.

12.     Second, there had also been what the Secretary of State believed to be an attempted "intrusion" on the Secretary of State's website. But this turned out to be the U.S. Department of Homeland Security, which was testing the website's security *at the request of the Secretary of State.*

13.     Election expert Rick Hasen summed up the story thus:

[The evidence] doesn't show Democrats "hacking" to manipulate election results. It shows Democrats, like many others, pointing out

the glaring security flaws in Georgia's voting system. To turn this around and blame Democrats is an act of political chutzpah by an election official on par with nothing else I've seen. . . . This is some banana republic stuff.[1]

14.    Defendants' actions, however, were not just "banana republic stuff." They were also illegal under federal law.

15.    42 U.S.C. § 1985(3) provides a private right of action against any conspiracy to prevent by intimidation a voter's support or advocacy for a candidate. It also allows for suit against actions taken to retaliate against an individual's support or advocacy for a federal candidate.

16.    Similarly, Section 11(b) of the Voting Rights Act provides a private right of action for intimidation or attempted intimidation connected to voting.

17.    Here, on the eve of the gubernatorial election, Defendants chose to accuse – without an iota of evidence – the Democratic Party of Georgia of unspecified "cyber crimes." They did so less than forty-eight hours before election day on the Secretary of State's own website where voters go to review sample ballots, find their polling location, or check their registration.

---

[1] Richard L. Hasen, *Brian Kemp Just Engaged in a Last-Minute Act of Banana-Republic Level Voter Manipulation in Georgia*, Slate (Nov. 4, 2018).

#3094488v1

18.     Defendants referred the matter to the Georgia Bureau of Investigation, but the GBI declined to conduct any investigation into the Democratic Party of Georgia – because there was no basis *even for an investigation*. The GBI concluded that there had never been any "hacking" in the first place.

19.     But Defendants' statements had accomplished their purpose. As reported by the Atlanta Journal-Constitution, Defendants "unsubstantiated claims came at a pivotal moment, as voters were making their final decisions in an election that had attracted intense national attention."

20.     Defendants' knowingly false accusations served to intimidate, threaten and deter the Democratic Party of Georgia's member-voters, and constituted retaliation against the Party for its support and advocacy for Democratic candidates.

21.     To protect the integrity of future elections in Georgia, Defendants must be held accountable for their violations of federal law.

## I.     JURISDICTION AND VENUE

22.     Plaintiffs' claims arise under the law of the United States. This Court has original jurisdiction over Plaintiffs' claims of federal rights violations pursuant to 28 U.S.C. §§ 1331, 1343(a)(3).

#3094488v1

23.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in that District.

## II.     **PARTIES**

*Plaintiffs*

24.     Plaintiff **Democratic Party of Georgia, Inc.** ("DPG") is a Georgia domestic nonprofit corporation dedicated to electing candidates of the Democratic Party to public office throughout the State of Georgia.  The DPG represents a diverse group of members and stakeholders across Georgia, including elected officials, candidates for elected office, state committee members, advisory caucuses, affiliate groups, and active voters. These members and constituents, including many eligible voters, regularly support and vote for candidates affiliated with the Democratic Party.  DPG's members vote in federal elections and aid and urge others in voting. DPG, its employees, volunteers, and members give support and advocacy in favor of the election of Democratic candidates for office, including candidates seeking election to the United States Congress.

25.     The Democratic Party of Georgia runs programs of aid, support, and advocacy to elect Democratic candidates across Georgia.  The DPG works to

#3094488v1

accomplish its mission by, among other things, making expenditures and working to increase turnout to elect Democratic candidates at both the state and federal level, including through get out the vote ("GOTV") and voter persuasion efforts. DPG also works to accomplish its mission by assisting Georgians through an extensive voter protection program to ensure that all eligible voters have access to the franchise.

*Defendants*

26.     Defendant **Brian Kemp** is the current Governor of Georgia. At all times relevant to this complaint, he was the Secretary of State of Georgia. He is sued in his individual and official capacities.

27.     Defendant **Candice Broce** is currently the Director of Communications and Chief Deputy Executive Counsel for the Office of the Governor of Georgia. At all times relevant to this complaint, she was an employee of and spokesperson for the Secretary of State of Georgia. She is sued in her individual and official capacities.

28.     Defendants **Does 1-10** are persons presently unknown to Plaintiffs after diligent search and inquiry.

#3094488v1

### III.   **STATEMENT OF FACTS**

**A.   As Secretary of State, Defendant Brian Kemp's office repeatedly mishandled voter information, falsely accused the U.S. Department of Homeland Security of "hacking," and declined federal assistance to secure their systems.**

29.    On December 31, 2009, Georgia Secretary of State Karen Handel resigned as Secretary of State because she had decided to run for Governor.

30.    She explained that she "did not want any perceived conflicts of interest concerning my overseeing the primary or general elections, investigating complaints that arise, and certifying the results of the elections while a candidate for Governor and serving as Secretary of State."[2]

31.    On January 8, 2010, Republican Governor Sonny Perdue appointed Defendant Brian Kemp to be Secretary of State of Georgia, thus filling the vacancy left by Handel.

32.    Defendant Kemp was subsequently elected to a full term as Georgia Secretary of State in 2010 and was reelected in 2014.

33.    His tenure was beset by a number of problems relating to cybersecurity.

---

[2] *Handel resigns as Ga. secretary of state*, Atlanta Business Chronicle, Dec. 22, 2009.

#3094488v1

34.     In October 2015, the Georgia Secretary of State's office, under Kemp's leadership, erroneously distributed personal data (including Social Security numbers and dates of birth) of 6.2 million registered Georgia voters. The data was sent to twelve news media and political party organizations on CD discs.

35.     Kemp's did not publicly acknowledge the mishap until The Atlanta Journal-Constitution reported the class action lawsuit against the office as a result of the data breach.

36.     In August 2016, computer researcher Logan Lamb, formerly of Oak Ridge National Laboratory, was able to access Georgia's entire voter registration database, including all personally identifiable information. The system was not password protected and was vulnerable to being rewritten. Seven months later, the information was still unprotected.

37.     That same year, Kemp was one of only seven state election directors to reject help from the Department of Homeland Security to guard against Russian interference.

38.     Later, Kemp accused the Department of Homeland Security of attempting to hack his office's computer network, including the voter registration database, implying that it was retribution for his previous refusal to work with

DHS. A DHS inspector general investigation found there was no hacking, but rather it was "the result of normal and automatic computer message exchanges generated by the Microsoft applications involved."

39.     The Secretary of State's office conceded eventually that they were wrong – that the office had "never been hacked."

**B.     The November 6, 2018, Georgia election had several closely-contested federal races. Then-Secretary-of-State Brian Kemp declined to recuse himself or resign, even though he was a candidate in the election for governor.**

40.     The Georgia gubernatorial election, held on November 6, 2018, was the closest in a half century.

41.     The polls showed the candidates neck-and-neck for months beforehand. The two front-runners were Republican candidate Brian Kemp and Democratic candidate Stacey Abrams.

42.     The November 6, 2018, election also included Congressional races for the Georgia's U.S. House of Representatives in districts 1-14.

43.     The race for Georgia's 7th Congressional District was also unusually close for the Democratic candidate Carolyn Bourdeaux. The final results had her lose the seat by 0.1% (earning 49.9% of the vote) to the Republican incumbent who had previously won the district each term with over 60% of the vote.

44.     Georgia's 6th Congressional District was another major battleground. The District was historically Republican and faced a contentious special election in 2017 where the Democratic candidate lost by only 3.6% of the vote. On November 4, 2018, the Democratic candidate Lucy McBath narrowly beat the Republican incumbent by 1% of the vote.

45.     At the same time as he was running for governor, Defendant Brian Kemp was serving as Georgia's Secretary of State and responsible for overseeing the election, tabulating results, and declaring a winner.

46.     By nature of his role as Secretary of State, Kemp also served as the Chairman of the State Board of Elections.

47.     Despite the conflict of interest and a historical pattern of Secretaries on the ballot recusing themselves or resigning their position, Kemp neither recused himself nor resigned.

48.     In the months leading up to the election, Kemp's office was chastised by this Court for its cyber-security, which held that:

> The State's posture in this litigation – and some of the testimony and evidence presented – indicated that the Defendants and State election officials had buried their heads in the sand. This is particularly so in their dealing with the ramifications of the major data breach and vulnerability at the Center for Election Services, which contracted with the Secretary of State's Office, as well as the erasure of the Center's

server database and a host of serious security vulnerabilities permitted by their outdated software and system operations.[3]

49.     In the end, Brian Kemp, the Republican nominee, received 50.2% of

the vote and Stacey Abrams, the Democratic nominee, received 48.8% of the vote.

**C.   Days before the 2018 election, private citizen Richard Wright identified security flaws in the Secretary of State's website, and reported it to several parties.**

50.     In late October 2018, Richard Wright, a private citizen of Georgia,

discovered two security problems with the State's voter registration and voter

information websites.

51.     First, he found that downloading a sample ballot also "allows you to

download any file on the system."

52.     Second, he found that the web address for each individual's voter

registration page included a unique numerical identifier, apparently assigned

sequentially. Just by changing the digits, he wrote, "you can download anyone's

data and that includes a lot" of personally identifiable information, such as driver's

license numbers or the last four digits of Social Security numbers.

53.     These were not particularly well-hidden flaws. According to Richard

DeMillo, the Charlotte B. and Roger C. Warren Chair in Computer Science at

---

[3] *Curling v. Kemp*, 17-cv-02989-AT, Dkt. 309 at *45 (N.D. Ga. Sept. 17, 2018).

Georgia Tech, there "are millions of people who know how to do this," including anyone with the book "Cybersecurity for Dummies."

54.     Kris Constable, who runs a privacy law and data security consulting firm, commented that the flaws are "so juvenile from an information security perspective that it's crazy this is part of a live system."

55.     Harri Hursti, a data security expert, commented that "This is the equivalent of having the bank safe door open . . . . And while it's open, you have the bank safe code posted on the door. People who have built this have no idea what they're doing."

56.     Wright was careful to test the vulnerabilities by only accessing information he had permission to view – his and his wife's voting information – thus avoiding any legal violation.

57.     Wright is not a member of the Democratic Party of Georgia, nor does he represent or work for the Democratic Party of Georgia.

58.     Wright is not affiliated with any political party.

59.     Wright would have gone directly to the Secretary of State's office with the vulnerability information, but based on the office's history with

cybersecurity, he "assumed the Secretary of State's office would not be receptive to reports of potential vulnerability."

60.     So on Friday, November 2, 2018, Wright first notified David Cross, a Washington lawyer at the firm Morrison Foerster who was pursuing a lawsuit about voter security in Georgia.

61.     David Cross is not a member of the Democratic Party of Georgia, nor does he represent or work for the Democratic Party of Georgia.

62.     According to the reporting of Who What Why, early in the morning of Saturday, November 3, 2018, David Cross notified the Secretary of State's Office (via Secretary Kemp's attorney John Salter) and the FBI of security problems with the State's voter registration and voter information websites.[4]

63.     Thus, Kemp's own lawyer was aware of the vulnerability the same morning the Democratic Party of Georgia was notified.

64.     Cross made clear that Richard Wright was the source of the information about the vulnerability. He provided the Secretary of State's attorney with Wright's contact information.

---

[4] Jordan Wilkie and Timothy Pratt, *Brian Kemp and his Staff Caught in a String of Falsehoods*, Who What Why (Nov. 6, 2018).

#3094488v1

65.     Later in the morning of November 3, 2018, Richard Wright also notified a voter protection volunteer, Rachel Small, at the DPG's headquarters.

66.     Rachel Small forwarded Wright's email to her supervisor, Sara Ghazal, DPG's Voter Protection Director, who in turn sent it to two people.

67.     One was Dr. Richard DeMillo, a security expert at Georgia Tech.

68.     The other was Dr. Wenke Lee, a security expert at Georgia Tech who was appointed by Brian Kemp to be the Information Technology and Cyber Security Expert for Georgia's Secure, Accessible & Fair Elections (SAFE) Commission.

69.     That day, Ghazal also contacted the Secretary of State's office and let them know about the security flaws.

70.     By 2:24 p.m. on November 3, 2018, the FBI had also alerted the Secretary of State to the vulnerability issues.

71.     At 7:03 p.m. on November 3, 2018, Bruce Brown, lawyer for the nonprofit Coalition for Good Governance, emailed John Salter and Roy Barnes, in their capacities as counsel to Secretary of State Kemp, to notify them of the serious potential cyber vulnerability.

72.     Receiving an email from Wright, forwarding it to two computer security experts, and then duly reporting it to the Secretary of State (who was already aware of the issue) was the entirety of the Democratic Party of Georgia's involvement in the issue.

**D**.     **Defendants had also received a report of an earlier "intrusion" on their systems, although there was no connection whatsoever to the Democratic Party of Georgia.**

73.     The weekend before the election, there was a "potential cyber intrusion" in the Secretary of State's network.

74.     The "intrusion" was completely unrelated to the vulnerabilities discovered by Richard Wright.

75.     The "intrusion" was determined to be "tests conducted by the United States Department of Homeland Security with which SOS contracted to do such work."

76.     That is, the intrusion was not a hack at all – it was the result of Defendants who *asked* and *contracted with* the Department of Homeland Security to test their network.

77.     At 10:02 a.m. on Monday, November 5, 2018, the Department of

Homeland security confirmed that the "intrusion" was part of their own security

testing.

78.     There was no evidence at all linking this intrusion to the Democratic

Party of Georgia as it was done at the behest of the Secretary of State's office by

the Department of Homeland Security.

**E.      Defendants Kemp, Broce, and Does conspired to baselessly accuse the
Democratic Party of Georgia of "cyber crimes."**

79.     At 4:47 a.m. on Sunday, November 4, 2018, two days before the

election, Candice Broce, the secretary of state's spokeswoman, received a message

from a reporter from the online news site WhoWhatWhy. The reporter indicated

that WhoWhatWhy was preparing to post a story at 6:00 a.m. describe a security

breakdown in the secretary of state's office.

80.     At 6:00 a.m., WhoWhatWhy published its story that "Georgia's Voter

Registration System Like 'Open Bank Safe Door.'"[5]

---

[5] Jordan Wilkie and Timothy Pratt, *Georgia's Voter Registration System Like
'Open Bank Safe Door'*, Who What Why (Nov. 4, 2018).

#3094488v1

81.     At 7:00 a.m., a statement appeared on the Secretary of State's website, on the same page where voters (especially on the eve of an election) search for sample ballots, find their polling place or check their registration.

82.     On information and belief, tens of thousands of Georgia voters accessed the Secretary of State's website from November 4th to the end of voting on November 6th, 2018.

83.     In all-capital letters, the headline announced: "AFTER FAILED HACKING ATTEMPT, SOS LAUNCHES INVESTIGATION INTO GEORGIA DEMOCRATIC PARTY." The text of the statement (attached here as Exhibit A) said:

> ATLANTA – After a failed attempt to hack the state's voter registration system, the Secretary of State's office opened an investigation into the Democratic Party of Georgia on the evening of Saturday, November 3, 2018. Federal partners, including the Department of Homeland Security and Federal Bureau of Investigation, were immediately alerted.
>
> "While we cannot comment on the specifics of an ongoing investigation, I can confirm that the Democratic Party of Georgia is under investigation for possible cyber crimes," said Candice Broce, Press Secretary. "We can also confirm that no personal data was breached and our system remains secure."

84.     In the afternoon of November 4, 2018, Broce sent a text message to reporters suggesting Small was suspected of criminal activity:

#3094488v1

The FBI is looking for information on 'Rachel Small.' We welcome any information about this person's identity or motives to provide to federal authorities. Who is Rachel Small? Is that her real name, and for whom does she work? Why was she talking about trying to hack the Secretary of State's system with Sara Ghazal, the Democratic Party of Georgia's Voter Protection Director? All information will be passed on to federal authorities. Anyone with information can contact our investigator, John Bagwell, at [phone number redacted].

85.    In justifying her actions, Defendant Broce referred to communications with her "chain of command," a chain which included Defendant Kemp and Doe Defendants.

86.    About the same time, Defendant Kemp's campaign released its own statement, claiming that Democrats had attempted "a fourth-quarter Hail Mary pass that was intercepted in the end zone" and that "[t]hese power-hungry radicals should be held accountable for their criminal behavior."[6]

87.    In an email, Broce stated that "expert cybersecurity vendors' concluded that 'someone had spent a great deal of time and effort, utilizing specialized equipment, to attempt to infiltrate the secretary of state's systems and that this attempt was potentially illegal."[7]

---

[6] Alan Judd, *How Brian Kemp turned warning of election system vulnerability against Democrats*, The Atlanta Journal-Constitution, Dec. 14, 2018.
[7] *Id.*

#3094488v1

88.     She said that the Secretary of State's office possessed "extensive forensic evidence" of attempted intrusions into its system, including "digital fingerprints of these thwarted attempts."[8]

89.     Later on November 4, 2018, Defendants released another press release entitled "SOS RELEASES MORE DETAILS OVER FAILED CYBERATTACK, OFFICIALLY REQUESTS FBI TO INVESTIGATE."[9] The statement announced that "We opened an investigation into the Democratic Party of Georgia after receiving information from our legal team about failed efforts to breach the online voter registration system and My Voter Page…We have contacted our federal partners and formally requested the Federal Bureau of Investigation to investigate these possible cybercrimes."

90.     The email identifying vulnerabilities had traveled from Richard Wright to Rachel Small to Sara Ghazal to Richard DeMillo to Bruce Brown to John Salter and then to the Secretary of State's office.

91.     Of those persons, only Small and Ghazal are affiliated with the Democratic Party of Georgia. But Defendants accused *only* the Democratic Party

---

[8] *Id.*
[9] *SOS Releases More Details Over Failed Cyber Attack, Officially Requests FBI to Investigate*.

of Georgia of cyber crimes, even though an attorney for Kemp himself was aware of the vulnerabilities at about the same time or before the Democratic Party of Georgia was even informed. Figure 1, below shows the flow of information.

**Figure 1:**   Many groups were involved in Defendants receiving information about the security flaws. But Plaintiff was the *only* group Defendants accused of "cyber crimes."



92.     The Secretary of State's knowingly false accusations of criminal conduct was picked up by the media, both domestic and foreign.

93.     For example, CNN ran a story that "Kemp's office launches probe of Georgia Democratic Party ahead of historic election."

94.     WSB-TV 2 Atlanta ran a story entitled "Democratic Party of GA accused of hacking voter registry; Abrams calls it desperate ploy," and described it as a "bombshell announcement."

95.     Time Magazine ran a story on November 4, 2018 that "Georgia's Brian Kemp Opens 'Cyber Crimes' Investigation Into State Democrats, 2 Days Before Election."

96.     The Hill ran a November 4, 2018 story saying that "Kemp's office opens investigation into Georgia Democrats for 'possible cyber crimes.'"

97.     Fox News ran a November 5, 2018 story entitled "Brian Kemp, Georgia gubernatorial candidate, explains how alleged criminal hacking linked to state Dems emerged."

98.   And Sputnik News Service, owned by the Russian government, ran a story with the headline "Georgia Dems 'Under Investigation for Possible Cybercrimes' Ahead of Midterms."

99.   Defendants were quick to baselessly accuse Plaintiff of "cyber crimes." They showed far less expediency in actually fixing the problem, however.

100.   By noon on November 5, 2018, a computer security expert confirmed that all of the vulnerabilities were still active.

101.   Despite having accused the Democratic Party of Georgia of "cyber crimes," Defendant Candice Broce also denied that there were vulnerabilities at all. In a statement to CNN, she said "There is no such vulnerability in the system as alleged by the ProPublica article . . .  We immediately reviewed claims of such vulnerabilities once we received them, and our cyber security team -- which includes top-notch, private sector cyber security vendors -- could not substantiate any of them."[10]

102.   But also on November 5, 2018, Broce made a public statement that the "Secretary of State's office is meeting with Department of Homeland Security,

---

[10] Krieg et al., *Kemp turns election system worries into a political weapon*, CNN (Nov. 6, 2018).

#3094488v1

Federal Bureau of Investigation, and Georgia Bureau of Investigation officials . . .
to discuss this investigation."[11]

103.   Ultimately, no investigation showed any wrongdoing by any person.
The Georgia Bureau of Investigation conducted an investigation into Richard
Wright, and found that "there is no indication that Wright obstructed, interrupted,
or interfered with the customer's access to the SOS's network or website nor does
it depict unauthorized access into the (My Voter Page) MVP server."

104.   The GBI investigation revealed "no evidence of damage to the SOS
network or computers, and no evidence of theft, damage, or loss of data." It found
no "evidence to support the criminal prosecution of Mr. Wright" and so
"recommend[ed] closing the file."

105.   Regarding the supposed investigation into the Democratic Party of
Georgia, Defendant Broce said "All you need, to open an investigation, is
information suggesting plans and an attempt to put together some kind of program
or utilize specialize [sic] tools to find a vulnerability."

---

[11] Democratic Party of GA accused of hacking voter registry; Abrams calls it
desperate ploy, WSB-TV (Nov. 5, 2018).

#3094488v1

106.   But there was no information whatsoever suggesting the Democratic Party of Georgia had any plans to find or exploit a vulnerability.  Indeed, they became aware of the issue after, or around the same time as, Kemp's own lawyer.

107.   And there was no information even suggesting an attempt by the Democratic Party of Georgia to put together some kind of program or utilize specialized tools to find a vulnerability.

108.   Defendant Broce later explained that the press release "was based on the information provided by cyber security vendors of the network intrusion attempts." But she admitted that the "vendors were unable to provide an attribution to who committed the attempts."

109.   The GBI did not conduct an investigation into the Democratic Party of Georgia at all because there was no basis for an investigation.

110.   The GBI investigation was limited to Richard Wright, who they cleared.

111.   Defendant Broce criticized the GBI investigation, and asked for more intrusive measures. For example, she suggested that Richard Wright should be "compelled to turn over his records, including access to his electronic devices, such as computers and cell phones."

112.    Defendant Broce furthermore spun a conspiracy theory that perhaps Richard Wright had "spoofed" his IP address to make himself appear to be the Department of Homeland Security, even though the Department of Homeland Security confirmed it was them.

## IV.    CAUSES OF ACTION

### *One* – 42 U.S.C. § 1985 – Conspiracy in Retaliation on Account of Support and Advocacy in a Federal Election

113.    Plaintiff incorporates and reasserts herein the allegations in paragraphs 1 through 112 of this Complaint.

114.    Subsection (3) of 42 U.S.C. § 1985 states as follows in pertinent part:

. . .if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

115.   Thus, 42 U.S.C. § 1985(3) provides a private right of action for the recovery of damages if two or more persons conspire to either:

a.   "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" in a federal election; OR

b.   "injure any citizen in person or property on account of such support or advocacy."

116.   There is no need for a "showing of specific intent or racial animus" to make out a Section 1985 claim.[12]

117.   Accordingly, it is sufficient that the Defendants conspired to commit the acts that resulted in intimidation or injury – regardless of whether that is what they sought to do.

118.   Here, Defendant Kemp has shown a pattern of falsely accusing Democratic administrations and Democratic parties of "hacking." In 2016, he accused President Obama's Department of Homeland Security of a "large attack on our system." Unsatisfied with the DHS explanation for why there was no attack,

---

[12] *LULAC v. Public Interest Legal Foundation*, No. 1:18-00423, Dkt. 63 at *7 (E.D. Va. Aug. 13, 2018).

Defendant Kemp asked the incoming Trump administration to investigate further. Later, he conceded that there had never been any hacking.

119.   In November 2018, Defendants repeated the same behavior. There were a number of persons and groups that found out and passed along information about the Secretary of State's website's vulnerabilities.

120.   Richard Wright, David Cross, Bruce Brown, the Coalition for Good Governance, several security researchers, the Democratic Party of Georgia, and others all found out about the vulnerabilities and passed the information along.

121.   The email identifying vulnerabilities went from Richard Wright to Rachel Small to Sara Ghazal to Richard DeMillo to Bruce Brown to John Salter and then to the Secretary of State's office. Of those persons, only Small and Ghazal are affiliated with the Democratic Party of Georgia.

122.   But Defendants chose only one of those parties to accuse of "cyber crimes" – the Democratic Party of Georgia.

123.   Defendants accused the Democratic Party of Georgia even though the Democratic Party of Georgia's only involvement was to (1) receive information from Richard Wright on a voter security hotline; (2) forward that information to two experts at Georgia Tech; and (3) inform the Secretary of State's office.

#3094488v1

124.   Defendants accused the Democratic Party of Georgia even though Who What Why's reporting indicates that Defendants' own counsel learned of the issue at approximately the same time or before the Democratic Party of Georgia did.

125.   Defendants conspired to accuse the Democratic Party of Georgia of cyber crimes without any basis.

126.   Defendant Kemp was part of the decision making regarding these events.

127.   For example, he made a public statement that "We found out about this, and when we did we acted immediately, which is the way we do it."[13]

128.   He also said "I'm not worried about how it looks. I'm doing my job. . . This is how we would handle any investigation when something like this comes up."[14]

---

[13] Samuel Chamberlain and David Lewkowic, *Brian Kemp, Georgia gubernatorial candidate, explains how alleged criminal hacking linked to state Dems emerged*, Fox News (Nov. 5, 2018).
[14] P.R. Lockhart, The last-minute hacking allegations in the Georgia governor race, explained, Vox (Nov. 5, 2018).

#3094488v1

129.   On November 5, 2018, Brian Kemp told Fox News that "our team is meeting right now with GBI, FBI, and Homeland security." He further said "we are handling this like we handle any other cyber security incident."[15]

130.   Defendants public statements claiming potential criminal conduct of the Democratic Party of Georgia were  prominently displayed on the Secretary of State's own website on the eve of the election and were viewed by voters accessing the website to review sample ballots, find polling places and check their registration.

131.   Defendants public statements included press statements and public releases and were repeated on media outlets throughout the State of Georgia and beyond.

132.   Defendants' public statements and referral to the GBI for investigation constituted substantial steps in furtherance of the conspiracy.

133.   There is a continuing harm as Defendants' "cyber crimes" statement is still maintained in public view on the website of the Secretary of State:

---

[15] Samuel Chamberlain and David Lewkowic, *Brian Kemp, Georgia gubernatorial candidate, explains how alleged criminal hacking linked to state Dems emerged*, Fox News (Nov. 5, 2018).

#3094488v1

https://sos.ga.gov/index.php/general/after_failed_hacking_attempt_sos_launches_i
nvestigation_into_georgia_democratic_party_ (last visited on Nov. 2, 2020).

134.   Defendants' choice to maintain the public statements on the Secretary
of State website even after they found out that the Democratic Party of Georgia
was not the source of the vulnerability information was and is an ongoing
substantial step in furtherance of the conspiracy.

135.   Defendants' choice not to remove the public statements on the
Secretary of State website even after they found out that the supposed "intrusion"
was the Department of Homeland Security acting at the request of the Secretary of
State was and is an ongoing substantial step in furtherance of the conspiracy.

136.   Defendants' choice to maintain the public statements on the Secretary
of State website even after the GBI cleared Richard Wright of any wrongdoing was
and is an ongoing substantial step in furtherance of the conspiracy.

137.   Defendants chose the Democratic Party of Georgia as the party to
publicly accuse of "cyber crimes" because of the Democratic Party of Georgia's
advocacy for and support of Stacey Abrams, Carolyn Bourdeaux, Lucy McBath,
and other Democratic candidates for Congress.

138.   In doing so, Defendants sought to injure the Democratic Party of Georgia on account of its advocacy for and support of Stacey Abrams, Carolyn Bourdeaux, Lucy McBath, and other Democratic candidates for Congress.

139.   In doing so, Defendants also took acts that worked to prevent by intimidation or threat Plaintiffs' members, including persons who are lawfully entitled to vote, from giving support or advocacy in favor of the election of candidates to be Members of Congress.

140.   Defendants act also intimidated and threatened Plaintiff, and caused Plaintiff injury in the form of frustrated mission efforts of enhancing voter turnout, fear of criminal prosecution, and public opprobrium.

141.   Plaintiff expended substantial time and effort combatting Defendants' actions, and was required to divert critical resources to combatting and remedying those harms.

## *Two* – Section 11(b) of the Voting Rights Act

142.   Plaintiff incorporates and reasserts herein the allegations in paragraphs 1 through 112 of this Complaint.

143.   Section 11(b) of the Voting Rights Act (52 U.S.C. § 10307(b)) provides that:

No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

144.   To state a claim under Section 11(b), there must be (1) a state or private actor, (2) intimidation of, or an attempt to intimidate, (3) a person for voting or attempting to vote or urging or aiding any person to vote or attempt to vote.

145.   Intimidation "is not limited to displays or applications of force, but can be achieved through manipulation and suggestion."[16]

146.   Accusations of criminal conduct are sufficiently threatening to constitute intimidation.[17]

147.   All those elements are met here.

---

[16] *United States v. Nguyen*, 673 F.3d 1259, 1265-66 (9th Cir. 2012) (finding letter sent to Hispanic voters warning of incarceration or deportation resulting from illegal voting could have "constituted a tactic of intimidation" under state law voter intimidation provision).

[17] *LULAC, supra. See, e.g., United States v. McLeod*, 385 F.2d 734, 747 (5th Cir. 1967) (threats of unwarranted criminal prosecution).

148.   In 2018, the Democratic Party of Georgia was urging and aiding persons to vote in the November 6, 2018 national election.

149.   Its members voted in the election, and urged and aided others to vote.

150.   Defendants are state and private actors who carried out acts of intimidation or attempted intimidation for the Democratic Party of Georgia's urging and aiding persons to vote.

151.   This is clear because of all the various people and groups who learned of the Secretary of State's vulnerabilities, Defendants chose *only* the Democratic Party of Georgia to accuse of crimes.

152.   As a result of Defendants' actions, the Democratic Party of Georgia, its employees, volunteers, and its members were subject to intimidation in that Defendants indicated that there were state and perhaps federal investigations into alleged "cyber crimes."

153.   The Democratic Party of Georgia itself suffered concrete and demonstrable injury to its activities and a diversion of critical resources in that it had to spend the time of employees, volunteers, spokespersons, lawyers, and candidates responding to Defendants' baseless accusations.

#3094488v1

154.   Defendants' actions have caused Plaintiff and its members to fear that future urging or aiding persons to vote will subject them to further false accusations, false prosecution, harassment, threats to safety, or economic hardship.

## V.   RELIEF REQUESTED

155.   Wherefore Plaintiffs request judgment be entered against Defendants and that the Court grant the following:

a.   Declaratory relief;

b.   Judgment against Defendants for Plaintiffs' asserted causes of action;

c.   Award of nominal damages of $20.00 or less;

d.   Award costs and attorney's fees pursuant to 42 U.S.C. § 1988;

e.   An injunction requiring Defendants to remove the statements from the Secretary of State's website;

f.   Order such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled (but not damages of more than $20.00).

156.   Plaintiffs state any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other

damages or remedies which this Court may seem equitable (but not damages of more than $20.00).

157.   Plaintiffs reserve the right to notice of defect to this pleading and reserve the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

This 3rd day of November, 2020.

Respectfully submitted by Plaintiff by and through its counsel,

*/s/ Manoj S. "Sachin" Varghese*
Manoj S. "Sachin" Varghese
Georgia Bar. No. 734668
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street NW, Suite 3900
Atlanta, GA 30309
(404) 881-4102
varghese@bmelaw.com

Gerald Weber
Georgia Bar No. 744878
LAW OFFICES OF GERRY WEBER, LLC
Post Office Box 5391
Atlanta, GA 31107
(404) 522-0507
wgerryweber@gmail.com

#3094488v1

William Most, La. Bar. No. 36914 *(pro hac vice to be filed)*
David Lanser, La. Bar No. 37764 *(pro hac vice to be filed)*
LAW OFFICE OF WILLIAM MOST
201 St. Charles Ave., Ste. 114, #101
New Orleans, LA 70170
(504) 509-5053
williammost@gmail.com